

**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS, REGION XV**

600 SUPERIOR AVENUE EAST, SUITE 750
CLEVELAND, OH  44114-2611

REGION XV
MICHIGAN
OHIO

SEP 2 8 2012

Catherine A. Tracey, Esq.
Miller Johnson
250 Monroe Avenue NW, Suite 800
P.O. Box 306
Grand Rapids, Michigan 49501-0306

Re: OCR Docket #15-11-1258

Dear Ms. Tracey:

This letter is to inform you of the disposition of the above-referenced complaint filed against the Forest Hills Public Schools (the District), on August 12, 2011, with the U.S. Department of Education (Department), Office for Civil Rights (OCR).  The complaint alleged that the District discriminated against a student (Student A) on the basis of sex. Specifically, the complaint alleged that the District failed to respond appropriately when the Student reported that she was sexually assaulted by a male student in a room at Forest Hills Central High School, which caused the Student to be subjected to ongoing harassment by the male student and other students.

OCR is responsible for enforcing Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*, and its implementing regulation, 34 C.F.R. Part 106.  Title IX prohibits discrimination on the basis of sex in education programs and activities that receive Federal financial assistance.  As a recipient of Federal financial assistance from the Department, the District is subject to Title IX.  OCR therefore had jurisdiction over this complaint.

Based on the complaint allegations, OCR opened an investigation into the following issues:

Page 2 – Catherine A. Tracey, Esq.

- whether the District failed to promptly and appropriately respond to alleged sexual harassment, resulting in a student, on the basis of sex, being excluded from participation in, being denied the benefits of, or being subjected to discrimination in any District education programs or activities in violation of the Title IX implementing regulation at 34 C.F.R. § 106.31; and

- whether the District has failed to adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of student complaints under Title IX in violation of the Title IX implementing regulation at 34 C.F.R. § 106.8(b).

During its investigation, OCR obtained and reviewed documentation submitted by the District and Student A's parents, and interviewed Student A's parents, Student A, District administrative staff, and the District's police liaison.

After a careful analysis of the information, OCR has determined that there is sufficient evidence to support a finding that the District failed to promptly and appropriately respond to alleged -sexual harassment in violation of and that its grievance procedures do not comply with Title IX requirements. However, the District has signed a Resolution Agreement, a copy of which is enclosed, that, once implemented, will remedy the Title IX violations. We set forth below the bases for OCR's findings.

## Summary of OCR's Investigation

- **Background**

This complaint was filed on behalf of Student A, who was in the tenth grade at Forest Hills Central High School at the time that she was allegedly sexually assaulted by a male student athlete (Student B). The incident occurred in a band room at the school on November 3, 2010, and was reported to a teacher on November 4, 2010. A few weeks later, a second female student (Student C) reported that Student B had sexually assaulted her in the school parking lot by touching her leg repeatedly and trying to climb on top of her while she sat in the driver's seat of her car.

Both of the female students who reported the sexual assaults remained at the high school through the end of the 2010-2011 school year. Student C, who was a senior at the time, graduated from high school at the end of the academic year. When Student A learned that the District was unwilling to remove Student B from the high school building where she attended, she requested that the District transfer her to a different high school within the District. Her request for a transfer was based on the November 3 incident described above, and the subsequent ongoing harassment and intimidation that she alleges occurred after November 3 and throughout the end of the 2010-2011 school year. The District permitted the change in enrollment and Student A enrolled at another high school within the District for the 2011-2012 school year. During the course of the investigation, OCR learned that Student B had moved out of the District on or around January 9, 2012, and

Page 3 – Catherine A. Tracey, Esq.

had enrolled at a different school district in Michigan. After OCR had completed its investigation but prior to the District signing the enclosed Resolution Agreement, OCR learned that Student A had requested to return to Central High School and that the District had granted her request.

- **Alleged Sexual Assault and the District's Response**

Student A's parents told OCR that Student A was sexually assaulted by Student B on November 3, 2010, around 3:00 pm in an unlocked band room at the high school. They said that Student A reported the assault the next day by giving one of her teachers a letter describing the incident. The parents stated that the teacher reported the information to the principal at Central High School. The parents stated that, upon learning about the incident, the principal called them to the school and told them that Student A had reported being assaulted by a male student who was also an athlete. The parents stated that the principal told them that they could file criminal charges or they could allow the school to conduct the investigation. The parents stated that on the following day they met with the District's police liaison at the high school and filed criminal charges against Student B.

The parents stated that many of the students at the high school knew that Student A had made a report of sexual assault and that the student body began to wonder if Student A had made false accusations against Student B when it became apparent that the District was not taking any disciplinary action against Student B. The parents alleged that the District's failure to take action resulted in an ongoing hostile environment for Student A. The parents also alleged that it was just two weeks after Student A was assaulted that Student C reported that Student B had sexually assaulted her.

OCR interviewed District witnesses and the deputy sheriff liaison to the high school, who confirmed that the District first learned about the incident on November 4. Documentation submitted by the District shows that Student A and some other students passed one of their teachers a letter describing a sexual assault involving Student A and Student B. The letter stated that the sexual assault involved an attempted rape, which was interrupted when Student A's cell phone began to ring. District witnesses confirmed that Student A's parents were contacted by the principal on the day they received the note and that the parents met with the deputy sheriff liaison on the following day. District staff stated that, upon receiving the note, they called Student A down to the office to confirm that it was a "real" situation. Once this was determined, the District immediately contacted Student A's parents and the Kent County Sheriff's department. Student A was kept in the office to wait for her parents that day and, when her parents arrived, the principal showed them the letter describing the alleged assault and then talked with Student A and her parents. District witnesses confirmed that the parents subsequently met with the sheriff liaison on the morning of November 5 so that he could facilitate the filing of a police report by the parents.

Page 4 – Catherine A. Tracey, Esq.

Student A's parents provided OCR with a letter, dated October 5, 2011, signed by the District's superintendent, which outlined the District's response to the parents' sexual harassment allegations. District staff confirmed that the superintendent had sent a letter to the parents and said that the District had not provided OCR with a copy of the letter with the District's data responses because the superintendent's letter was sent after the District submitted its data responses to OCR. The letter stated that the District first learned of the incident on November 4, 2010, and that law enforcement officials from the Kent County Sheriff's Department initiated an investigation right away. The letter also stated in pertinent part:

> While this matter was in the initial stages of investigation by the KCSD, the district continued its own investigation interviewing [both students] and other students. Administrators at Central High School soon reached an impasse in their internal investigation, as they were unable to reach a definitive conclusion as to what happened on November 3, 2010, based upon the evidence available to us. It was at this point that we decided not to close this matter, but to hold any potential school-based disciplinary consequences in abeyance until the outcome of the KCSD investigation and any disposition of possible criminal charges. We felt it might be possible that additional evidence or information could come to us through these legal proceedings that could assist the district in its investigation.

The letter also outlined the sanctions that were taken by the District against Student B on December 10, 2010, a little over five weeks after the incident was reported, and then in September 2011, ten months after the incident was reported. The letter indicated that the sanctions taken against Student B were not based upon the outcome of the District's Title IX investigation but rather were contingent upon the outcome of the criminal charges that were filed against him. The letter, which was dated eleven months after the incident was first reported, informed Student A's parents that the matter was closed.

District witnesses reported to OCR that the District's investigation was conducted by the high school principal. The principal stated that he began his investigation on the same day he learned about the incident and met with Student A's parents. He stated that he started by reviewing the video surveillance footage. The principal stated that during the course of his investigation he learned that the alleged incident took place in one of the band practice rooms after school around 2:30 pm or 3:00 pm. The principal stated that the band room, where the alleged assault took place, is located outside of the main building but is connected by a hallway. Outside the band room there are a number of practice rooms, which are 10' x 15' in size and are soundproof. He said that students and adults in the hallway outside the rooms at that time did not hear anything, although that did not mean much to him since the rooms were soundproof. The principal told OCR that he did not know if there would have been any noise to hear because "the gal did not say much about screaming." The principal did not take notes from any of his conversations with the individuals who were outside of the band room on that day.

Page 5 – Catherine A. Tracey, Esq.

The principal explained to OCR that the video showed the two students walking down the hallway after the alleged incident happened. He said that within a matter of seconds they were back out with the rest of the student body, and he watched their socialization patterns. He stated that he could not see what happened in the band room or in the hall outside the band room because there are no cameras in that area. He said that, once the students came back into view, he saw them walking down a hallway away from the band room and they were being kind of "chummy." He said they were walking together and there was some physical contact like touching on the shoulder and it did not look like one student was trying to escape from the other. He said it looked to him like two students walking down the hall and "shooting the breeze." He said they walked through the cafeteria together. Then he said that they went to talk to their friends. He said that Student B went off to practice and Student A sat down and had a conversation with some of her friends. The principal said that his overall view of the tapes was that both students were present at the time and location in question. He saw nothing "outstanding or outrageous," positive or negative, to indicate who was telling the truth. The principal stated that the only thing he could verify is that they did come out of the band hallway together and there was some contact, but he could not tell exactly what kind of contact.

The principal told OCR that he believed the two students were in the band room for two to five minutes at the most. OCR reviewed police notes about the video footage, which indicated that there was a period from 2:58 pm until 3:16 pm during which Student A and Student B were out of the camera range. Specifically, the notes state that at about 2:58 the students were seen heading toward the band room area and they did not come back into view until 3:16. When asked about this 18-minute gap indicated in the police records, the principal stated that since there are no cameras in the hallway outside the band rooms so it was possible that Student A and Student B were in the room the entire time, but it was also possible that they were in the hallway during that time. OCR was not successful in its attempts to secure a copy of the video footage from the District.

The principal said he interviewed Students A and B as part of his investigation and that he compared their statements to the other available evidence. He also told OCR that he did not ask the students how long they were in the room or how long they were in the hallway because even though they said different things happened, they both described something that seemed to last a short period of time. He said during his interview of Student A she put emphasis on Student B walking around the halls and "being interested in her." She then said that the lights went off and he penetrated her with his finger. The principal also interviewed Student B, who he said told him that Student A had been telling him all day that she had a secret to tell him. The principal said Student B told him that after school Student A pulled him into the room, flipped off the light, and said to him, "I want to be your girlfriend but I am afraid you are a player." Student B then told her that he was not interested in her and they both walked away. According to Student B's version of events, there was no sexual contact between the students. The principal also did not keep notes of his conversations with them.

Page 6 – Catherine A. Tracey, Esq.

The principal said that Student A was obviously "very affected by everything" during her interview. He said she was upset because she said she had been attacked and she "did not ask for it." He said when she came in initially to see him she was not crying but she did break down and cry while she was reading her note to her parents. He stated that he observed Student B's demeanor during his interview to be amazement at the charges made against him and denial.

The principal stated that he considered his investigation to include the investigation conducted by the police and that the criminal investigation would have been conducted according to the District's Title IX investigation and grievance procedures. The principal stated that he stopped investigating the incident when he was told by a detective from the county sheriff's department to discontinue an independent investigation. He said that at that point he had already talked to Student A and Student B and had reviewed the videotape, but he had not interviewed any other witnesses. The principal stated that the detective did not prevent him from resuming the District's investigation after the criminal investigation was completed but that he did not resume the investigation because he was never notified that the criminal investigation was completed. The principal said he contacted the sheriff's department several times to inquire about an update on the case but he was never given any helpful information. Other District witnesses confirmed that the District's investigation was not resumed after the criminal investigation had concluded. According to the principal, however, he had already done everything he felt needed to do to complete an investigation for the District. He said the police allowed him to sit in on their interviews, but there were not many people interviewed because the matter was basically between Student A and Student B. He said that he did not consider the results of the rape kit done in the criminal investigation because they were never shared with the District. He said he did not ask Student A or her parents for information from the rape kit to support their allegation. When asked if the District used a specific standard of proof in its investigation, the principal stated that they were just trying to make a determination about who was telling the truth.

The principal told OCR that he and his staff had talked to several students about the incident, but that none of the discussions were initiated on the part of the District. He said that students had begun to take sides in the matter and so they would come to the office and report things. He said that the District never tried to go back and prove or disprove what had happened. He said he did not keep notes, record names or dates, or put into writing any of the "things" that the students reported. He said he felt that most students were just taking sides and they were saying things that were unsubstantiated so he did not see the need to keep a record. The principal was unable to recall for OCR any details of what the other students reported. The District also provided an email indicating that the principal held two emergency meetings to address the alleged incident.

With regard to Student C's report of a sexual assault against her by Student B, the principal said he first learned about Student C from Student A's father who called him and told him about her. After learning about the situation from Student A's father, the principal called Student C to the office and asked her about whether or not something had happened with Student B. The principal said she told him that she did not know what he

Page 7 – Catherine A. Tracey, Esq.

was talking about and that it was not true. The principal said that within two days of that conversation, however, Student C came back to his office and said, "It happened." When asked what happened, Student C told the principal that she had picked Student B up from school and they drove around. Then they went to park in the school parking lot and Student B kissed her and then he tried to touch her. The principal did not take notes during his meeting with Student C, but he said that Student C wrote out a police statement and talked to the police. Student C later informed the District and the police department that she was unwilling to participate in an investigation.

In Student C's statement to the police, she said that Student B sent her a text message around 4:30 pm on November 15, 2010, asking her to pick him up. She said she picked him up and, while they were driving around in her parent's car, he began to touch her thigh and groin area. She said she told him to stop several times and he mocked her and asked her why she was rejecting him. She also said that he used his physical strength to prevent her from moving his hand away. She stated that she drove to the high school's overflow parking lot and parked the car with the radio playing. She stated that at this time Student B forcefully moved his hand up her thigh and began touching her in her groin area through her jeans. He also kissed her neck and tried to push his hands into the back part of her pants. She also said that he touched her breasts and then told her it was an accident.

Although the principal told OCR that the police did not inform him when they had concluded their investigation into the alleged sexual assault against Student A, in an email to the superintendent the principal reported that the police had interviewed eight students in total and had reviewed the camera footage. The e-mail also stated that the case was officially closed on November 17, 2010, due to insufficient evidence. The email also reported that he had received information about a second alleged sexual assault. District witnesses confirmed that no written disposition of the District's findings was ever issued to Student A's parents. District witnesses asserted that the District did not make a finding on whether or not sexual harassment had occurred because they were waiting for information from the police to determine whether or not a school rule had been broken. District witnesses asserted that they felt they did not have the kind of proof that would allow them to make a decision. The principal also confirmed that he questioned Student B about the alleged incident, but did not otherwise conduct an independent investigation of the sexual assault reported by Student C.

OCR obtained information contradicting the District's assertion that it interviewed Student A. Student A told OCR that, instead of interviewing her, the principal just read the letter she had written about the incident. Student A stated that no one from the District ever asked her about the specific details that occurred on the day of the incident, and that the District did not ask her to identify witnesses or to provide the other corroborating evidence (such as a rape kit or her cell phone records) she had to support her allegation. Witness statements, including statements made by District staff, also confirmed that Student A was told not to talk about the incident at school.

Page 8 – Catherine A. Tracey, Esq.

OCR interviewed the deputy sheriff liaison officer who is assigned to the District. He stated that he is employed by the sheriff and he works for the District as his full-time assignment. He stated that ultimately he reports to the sheriff and his direct line report is a sergeant. Regarding matters that happen in the schools, he also reports to the superintendent. He has an office at each of the three high schools in the District, and he spends most of his time at the high schools. The deputy sheriff liaison said that he had not had any training on Title IX or the District's Title IX grievance procedures. The deputy sheriff liaison said that he did not interview Student A or Student B. The sheriff liaison stated that during his first meeting with Student A's parents he told them how a criminal matter would proceed and that their daughter might have to testify in court. He also told them that it would be helpful to take Student A to meet with a nurse examiner in order to obtain a rape kit. He gathered the written statements and information supplied by both students and their parents and compiled it into a police report, which he forwarded to the police department for follow-up. The sheriff's department assigned the case to a detective who specializes in sexual assault cases. He viewed the video surveillance and identified each time he saw Student A and Student B on tape during that day. He had the information burned on to a CD, which was also forwarded to the detective. He said that the detective conducted the witness interviews and the liaison did not sit in on the interviews. The deputy sheriff liaison said that he had no involvement in the investigation of the allegations made by Student C.

District witnesses confirmed that the individual who was responsible during the relevant time period for the District's Title IX compliance (the Title IX coordinator) is currently retired. District witnesses confirmed that the Title IX coordinator was informed about the incidents of alleged sexual assault, but she did not conduct her own investigation; rather she obtained information from the high school principal. She did not finalize the information she obtained into a written report; she did not interview witnesses or independently gather information. District staff also confirmed that they did not provide Student A or her parents with information about Title IX or their rights under Title IX.

Student A's parents alleged that the District's inaction resulted in Student A being subjected to an ongoing hostile environment throughout the remainder of the 2010-2011 school year. They stated that during the 2010-2011 school year they had numerous contacts with administrators at the District regarding the sexual assault of Student A. They said that no one from District ever advised them of their rights or Student A's rights under Title IX and at no time were they provided with any information about the District's Title IX grievance process. Student A's parents prepared a timeline of events from November 3, 2010 (the date of the incident) until August 25, 2011 (the date of Student A's transfer request to a different District high school), with corresponding emails and submitted a copy to OCR. This information showed 15 contacts made by Student A's parents to various District staff between November 22, 2010, and June 2, 2011, including numerous requests to the District to expel or otherwise discipline Student B and complaints that Student A was being subjected to ongoing stalking and other harassment and intimidation by Student B and other students.

According to Student A's mother, District staff never responded to her complaint that Student B was stalking Student A and that he and his friends were trying to intimidate her. With respect to their requests for Student B to be expelled or disciplined, the principal told them that his investigation was inconclusive and he could not discipline Student B without proof that he had done something wrong, and that he hoped to obtain this proof when the Kent County Sheriff's Department concluded its criminal investigation. Student A's parents met with the superintendent in December 2010 to complain about the principal's inaction. During that meeting, Student A's parents asked the superintendent why Student B was still playing basketball when the District's athletic code of conduct required the District to suspend athletes who are charged with certain crimes. Upon learning that Student B had been criminally charged, the District suspended Student B from the basketball program but took no further action.

On January 24, 2011, Student A's parents emailed the District's then-Title IX coordinator to advise that, as a result of the sexual assault by Student B and subsequent harassment by Student B's friends, Student A no longer felt safe attending activities after school, including academic study sessions that would help her in the classroom, her cheerleading activities, or attending the boys basketball games.

OCR reviewed a copy of the parents' January 24 email, referenced in the above paragraph, that included the principal's input to the Title IX coordinator as to how she should respond. The principal's response to the parents' complaints was that Student B was not practicing after school with the team or staying after school unsupervised and had not been to any games, that Student A did not try out for winter sideline cheer so she had made up her mind about cheerleading before any of the alleged acts occurred, that the building staff did not witness or have any information concerning any encounters between Student A and any other students, that no formal discipline of Student B had been carried out because they had no proof that any violation of the student code of conduct had taken place, and that Student A has seen her guidance counselor numerous times. There was no indication that an investigation was initiated by the Title IX coordinator to determine what had happened or that proactive steps were established to ensure that Student A could access in-school and after-school activities.

On February 10, 2011, Student A's mother forwarded to the Title IX coordinator excerpts from a social networking site, www.formspring.me, which she described as "anonymous vicious attacks" that Student A had been subjected to since the incident, as one example of the daily harassment Student A was facing.

OCR reviewed the excerpt from Formspring,[1] which was entitled, "Ask away. Just don't be mean!!! :)" Several comments on this interactive website were in support of Student A. However, some comments made by classmates included:

---

[1] Formspring is an interactive web based application that is accessible through Facebook. An individual who wants to use Formspring sets up the page so other people can log on and ask questions to the user in a semi-public forum. Student A set up her webpage prior to the 2010-2011 school year.

Page 10 – Catherine A. Tracey, Esq.

1. youre fat youre ugly you suck at soccer and you need to grow
   someballs and tell the skool ur lying why do u always have to lie
   about everything EVERYTHING stop ruining [Student B's] life its
   ur fault b—ch

2. do u realize the only action ur ever going to get is from when
   [Student B] supposedly raped u?

3. does it make you feel good to ruin star basketball players dreams
   and potencials? [classmate's name] thinks you are a c—t

4. y the f—k do you still go to fhc when its ur fault [Student B] cant
   play cuz ur a lying whore who over exaggerates

On February 10, 2011, the Title IX coordinator replied to the email from Student A's
mother thanking her for "sending this on." Student A told OCR that the principal told her
there was nothing that the District could do about the harassing statements made to her on
Formspring because they did not occur on school property.

On April 14, Student A's mother again contacted the Title IX coordinator to complain
that Student B was at an afterschool track meet where Student A was also present for her
soccer game. The Title IX coordinator replied on April 15 asking Student A's mother if
she saw that Student B was on the track team or just attending the meet. The parent
advised her that Student B was attending the meet as a spectator and he walked behind
Student A "whispering things" as she walked to her game at the soccer field. The parent
stated that Student B needed to be reminded to stay away from Student A and that any
remarks towards her were unacceptable. The Title IX coordinator replied to the parent's
email, asking if Student A had reported Student B's comments to an administrator or
counselor, suggesting that would be helpful, and indicating that the high school principal
was unaware of any issues. There was no indication that an investigation was initiated by
the Title IX coordinator to determine what had happened or that proactive steps were
established to ensure that Student A could access after-school activities.

On April 19, 2011, the parents again contacted the high school principal stating that
Student A had reported to them that Student B was pushing other students into her in the
hallway when he walked past her. They expressed their concern that Student B was
becoming more aggressive. District witnesses asserted that appropriate sanctions were
issued by the District; however, OCR requested documentation to support this assertion
and the District never provided it.

Student A told OCR that her grades suffered during this time, because she was not going
to class and was missing a lot of instruction. The District asserted that Student A's
grades did not suffer as alleged following the November 2010 incident and submitted a
partial transcript for her in support of this assertion. The transcript showed that her
grades averaged Bs and ranged from As to C-s both before and after the fall of 2010.
However, Student A said that she stopped attending class regularly because she would

begin to cry. She started going to the office around second hour and doing her work in one of the meeting rooms there for the rest of the day. She said this went on for several weeks. She stated that one day her guidance counselor told her that she could not keep coming to the office and that she needed to get counseling. She said that the guidance counselor told her that she was not qualified to counsel her but that she would recommend to Student A's mother that she seek counseling for her.

Student A also said that she lost friends during the school year because she had reported the sexual assault. She said students taunted and pushed her at school following the investigation and that Student B frequently followed behind her saying things like, "you ugly" and "you're a liar." Student A also stated that people at school, including the principal, told her that she did not have any witnesses to support her allegations and that she could be lying. She described a school basketball game that she attended, before Student B was suspended from the team, when he made a dunk shot and a group of boys in the stands starting chanting, "GO HOME" and pointing to her. She said that, after Student B was suspended from the basketball team, her classmates would chant "Free the Beast" at basketball games, referring to his suspension from the team. She said that she was never interviewed by anyone at the District about any of these incidents and as far as she knows they never looked into any of the incidents other than the one time that Student B had pushed his friend into her in the hallway. She stated, however, that she had observed at least two teachers escort Student B to the office—once when he was picking on her in the hallway and once when he was standing outside of her class and she was afraid to leave the room.

District staff indicated that they took the following interim measures to prevent Student A and Student B from having contact with one another and to protect Student A: both students were given a contact person in the office with whom they could meet at any time; both students were told not to talk about the situation anymore; Student B's schedule was changed; and both Student A and Student B were told to stay away from each other. OCR reviewed the class schedules for Student A and Student B and noted that the class changes were dated as having occurred November 22, 2010, which is approximately 2.5 weeks after the incident was first reported to the principal. Other steps that were taken by District staff included making sure that they locked down the building after each school day and communicating to the students that they had to leave the building and could not hang around the halls after school.

When asked what steps were taken to respond to Student A's parents' complaints that Student B was following her in the hallway at school, the principal indicated that the District could not determine whether that actually occurred or was something Student A was imagining due to her anxiety over the incident. When asked whether or not he investigated the subsequent complaints of ongoing harassment made by the Student A's parents, the principal said that in December 2010 there was a complaint made that Student A could not participate in cheerleading because she was afraid to stay after school but that Student A had not participated in the tryouts for basketball cheerleading. He said that tryouts for basketball cheerleading would have been held in the fall before the incident occurred so she must have made the decision not to cheer prior to this

incident occurring. The principal further stated that Student A never complained about further harassment and that all the complaints came from her parents. He said that, except for the pushing incident which, as noted above, the District claimed to have handled, the parents' concerns were always general and never specific. He also said that he never heard that Student A was booed or taunted at a basketball game.

- **The District's Title IX Grievance Procedures**

As previously noted, Student A's parents told OCR that the District did not provide them with information about Title IX when they were first notified by the principal that Student A may have been involved in a sexual assault incident. Furthermore, they stated that they were not provided with information about Title IX when they met with the District's Title IX coordinator. The parents said that when they first met the District's Title IX coordinator, she did not inform them about her responsibilities under Title IX and did not provide them with any information about how to file a grievance. They also stated that they searched the District's webpage and they were unable to find information about Title IX covering sexual harassment or how to file a grievance of sexual harassment.

During the course of its investigation, OCR examined the District's policies and procedures regarding sexual harassment. The District has a statement of nondiscrimination in its handbook for Central High School, which includes the contact information for its Title IX coordinator, although it still lists by name the former assistant superintendent of human resources, who is no longer in the position. The statement of nondiscrimination in the student handbook includes a prohibition on sex discrimination and makes reference to Title IX and states that complaints will be investigated in accordance with procedures described in Board Policy 2260. It also includes a statement prohibiting retaliation. The statement of nondiscrimination does not explain that sexual harassment is a form of sex discrimination.

The District also has Board Policy 5517, Harassment of Students. This policy prohibits any type of harassment that would negatively impact students, and includes but is not limited to harassment based on sex, race, color, national origin, height, weight, marital status and disability. Board Policy 5517 states that "any student that believes s/he has been or is the victim of harassment should immediately report the situation to the teacher, the principal or assistant principal, or may report it directly to the Assistant Superintendent for Human Resources (District Compliance Officer). Complaints will be investigated in accordance with AG 5517." The policy states that electronically transmitted forms of harassment may also be subject to disciplinary measures whether it takes place on or off school property. In a separate part of the Board of Education's Bylaws, the District defines sexual harassment and other prohibited conduct and also states that the harassment of a student, staff member or third party is strictly forbidden.

Page 13 – Catherine A. Tracey, Esq.

In a separate policy document -- Guidelines, Office of the Superintendent Forest Hills Public School District, 2260B -- the District sets forth its grievance procedures for Title VI, Title IX and Section 504. The guidelines state that complaints or grievances will be referred to the District's Civil Rights Coordinator. It does not identify the assistant superintendent of human resources as the Civil Rights Coordinator and does not provide any contact information. The grievance procedures require complaints to be made informally and on a verbal basis prior to submitting a formal grievance. The grievance procedures state that the Coordinator will further investigate and reply in writing to the complainant within five business days. However, the grievance procedures do not set forth the major stages of the initial formal investigation that is to be conducted by the Civil Rights Coordinator. The grievance procedures also do not provide an assurance that the investigation will be adequate, reliable, and impartial. The grievance procedures allow parties to appeal first to the Superintendent and then to the Board of Education. The grievance procedures also state that parties may appeal the District's decision to OCR, and that inquiries about the procedures should be directed to OCR's headquarters.

## Applicable Regulatory and Policy Standards

The Title IX implementing regulation, at 34 C.F.R. § 106.31(a), provides that no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance. Specific obligations are set forth at 34 C.F.R. § 106.31(b), including a recipient's obligation to ensure that its students are not denied or limited in their ability to participate in or benefit from the recipient's programs or activities on the basis of sex.

Sexual harassment is a form of sex discrimination prohibited by Title IX. Hostile environment sexual harassment is unwelcome conduct of a sexual nature that is sufficiently serious that it denies or limits a student's ability to participate in or receive the benefits, services, or opportunities of a school's program. Sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence.

In examining whether the sexual harassment was severe, persistent, or pervasive enough to deny or limit a student's ability to participate in or receive the benefits, services, or opportunities of a school's program, OCR considers all relevant circumstances, including the degree to which the conduct affected one or more students' education; the type, frequency, and duration of the conduct; the identity of and relationship between the alleged harasser and the subject or subjects of the harassment; the number of individuals involved; the age and sex of the alleged harasser and the subject of the harassment, the size of the school, location of the incidents, and the context in which they occurred; other incidents at the school; and whether there were also incidents of gender-based but non-

Page 14 – Catherine A. Tracey, Esq.

sexual harassment. A sexually hostile environment may deny or limit a student's ability to receive the benefits, services, or opportunity of a school's program even if there are no tangible effects, e.g., a drop in the victim's grades.

The more severe the conduct, the less the need to show a repetitive series of incidents; this is particularly true if the harassment is physical. A single or isolated incident of sexual harassment may, if sufficiently severe, create a hostile environment. Moreover, a series of incidents at the school, not involving the same students, could - taken together - create a hostile environment, even if each by itself would not be sufficient.

When responding to harassment, a school must take immediate and appropriate action to investigate or otherwise determine what occurred. The specific steps in a school's investigation will vary depending upon the nature of the allegations, the source of the complaint, the age of the student or students involved, the size and administrative structure of the school, and other factors. In all cases, however, the inquiry should be prompt, thorough and impartial. Schools also should inform and obtain consent from the complainant (or the complainant's parents if the complainant is under 18 and does not attend a postsecondary institution). If the complainant requests confidentiality or asks that the complaint not be pursued, the school should take all reasonable steps to investigate and respond to the complaint consistent with the request for confidentiality or request not to pursue an investigation. If a complainant insists that his or her name or other identifiable information not be disclosed to the alleged perpetrator, the school should inform the complainant that its ability to respond may be limited. The school also should tell the complainant that Title IX prohibits retaliation, and that schools officials will not only take steps to prevent retaliation but also take strong responsive action if it occurs.

While investigating an allegation of sexual harassment in the school setting, it may be appropriate for a school to take interim measures during the investigation of a complaint. For instance, if a student alleges that he or she has been sexually assaulted by another student, the school may decide to immediately place the students in separate classes to prevent further harassment while the complaint is investigated.

If a student sexually harasses another student, the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and the district knew or reasonably should have known about the harassment, the district is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence. Appropriate steps to end harassment may include separating the accused harasser and the target, providing counseling for the target and/or the harasser, or taking disciplinary action against the harasser. These steps should not penalize the student who was harassed. In addition, depending on the extent of the harassment, the school may need to provide training or other interventions not only for the perpetrators but also for the larger school community to ensure that all students, their families, and school staff can recognize harassment if it recurs and know how to respond. A school may also be required to provide additional services to the student who was

Page 15 – Catherine A. Tracey, Esq.

harassed in order to address the effects of the harassment, particularly if the school initially delayed in responding or responded inappropriately or inadequately to information about harassment.

Certain acts of sexual harassment, such as unwelcome sexual touching, may also be criminal in nature, in which case it may be appropriate for a school district to contact law enforcement authorities. However, contacting law enforcement authorities does not relieve a district of its individual obligation to investigate and address acts of sexual harassment occurring at school or during school-sponsored activities. The legal standards applied for criminal investigations are different than the standards applied under Title IX, and thus a district cannot rely on a police investigation to fulfill its Title IX obligations. Further, certain remedies, such as separating the student reporting the harassment from the alleged perpetrator in classes, at lunch, etc., can only be implemented by the school and are the school's responsibility.

Finally, a school should take steps to stop further harassment and prevent any retaliation against the person who made the complaint (or was the subject of harassment) or against those who provided information as witnesses. At a minimum, the school's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conduct follow-up inquiries to see if there have been any new incidents or any instances of retaliation, and responding promptly and appropriately to address continuing or new problems.

The Title IX regulation, at 34 C.F.R. § 106.8(a), requires a recipient to designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX and its implementing regulation, including any investigation of any complaint communicated to such recipient alleging its noncompliance with Title IX or alleging any actions which would be prohibited by Title IX. The recipient must notify all its students and employees of the name, office address, and telephone number of the employee or employees appointed.

In addition, the Title IX regulation, at 34 C.F.R. § 106.8(b), requires a recipient to adopt and publish procedures that provide for the prompt and equitable resolution of student and employee complaints alleging any actions prohibited by Title IX and its implementing regulation. OCR has identified a number of elements in evaluating whether a recipient's grievance procedures are prompt and equitable, including whether the procedures provide for: (1) notice of the procedure, including where complaints may be filed; (2) application of the procedure to complaints alleging harassment carried out by employees, other students, or third parties; (3) adequate, reliable, and impartial investigation of complaints; (4) designated and reasonably prompt timeframes for the major stages of the complaint process; and (5) notice to the parties of the outcome of the complaint.

Grievance procedures may include informal mechanisms for resolving sexual harassment complaints to be used if the parties agree to do so. OCR has frequently advised schools, however, that it is not appropriate for a student who is complaining of harassment to be

Page 16 – Catherine A. Tracey, Esq.

required to work out the problem directly with the individual alleged to be harassing him or her, and certainly not without appropriate involvement by the school (e.g., participation by a counselor, trained mediator, or, if appropriate, a teacher or administrator). In addition, the complainant must be notified of the right to end the informal process at any time and begin the formal stage of the complaint process. In some cases, such as alleged sexual assaults, mediation will not be appropriate even on a voluntary basis. In order for a school's grievance procedures to be consistent with Title IX standards, the school must use a preponderance of the evidence standard (i.e., it is more likely than not that sexual harassment or violence occurred). Grievance procedures that use the higher standard of "clear and convincing" standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.

Accordingly, regardless of whether harassment occurred, a school violates this requirement of the Title IX regulations if it does not have those procedures and policies in place. A school's sex discrimination grievance procedures must apply to complaints of sex discrimination in the school's education programs and activities filed by students against school employees, other students or third parties. Title IX does not require a school to adopt a policy specifically prohibiting sexual harassment or to provide separate grievance procedures for sexual harassment complaints. However, its nondiscrimination policy and grievance procedures for handling discrimination complaints must provide effective means for preventing and responding to sexual harassment. Thus, if, because of the lack of a policy or procedure specifically addressing sexual harassment, students are unaware of what kind of conduct constitutes sexual harassment or that such conduct is prohibited sex discrimination, a school's general policy and procedures relating to sex discrimination will not be considered effective. A grievance procedure applicable to sexual harassment complaints cannot be prompt or equitable unless students know it exists, how it works, and how to file a complaint. Distributing the procedures to administrators, or including them in the school's administrative or policy manual, may not by itself be an effective way of providing notice, as these publications are usually not widely circulated to and understood by all members of the school community.

## Analysis and Conclusion

The District was notified about the first alleged sexual assault within one day of its occurrence and the second alleged assault within four days of its occurrence. In determining whether or not the District was notified of an alleged hostile environment, OCR considered whether, if true, the allegations constituted conduct of a sexual nature that was severe, persistent, or pervasive enough to deny or limit a student's ability to participate in or receive the benefits, services, or opportunities of a school's program. In the instant case, the first allegation of harassment involved an unwanted sexual assault, including vaginal penetration. Such action is sufficiently severe that an isolated occurrence would constitute sexual harassment. The second allegation of harassment, which involved a different female student but the same harasser, was also physical in nature. In the second case, the harasser used his physical strength to prevent the female student from being able to remove his hand from her thigh and groin area. Such actions

Page 17 – Catherine A. Tracey, Esq.

are sufficiently severe to constitute sexual harassment. Moreover, the information obtained by OCR supports that students at the high school began to take sides soon after the incident occurred and the reports of sexual harassment were made, which subjected Student A to an ongoing hostile environment and had a negative impact on the overall climate of the student body that was not addressed. OCR also noted that this unaddressed climate may have impacted Student C's decision not to proceed with the complaint.

OCR then looked to see whether the District took immediate and appropriate action to investigate or otherwise determine what occurred in a prompt, thorough, and impartial manner. OCR finds that the District did not thoroughly or promptly investigate either allegation of sexual harassment. OCR also notes that, even though Student C decided not to participate in an investigation or to file criminal charges, the District may have had a duty to investigate Student C's report and to respond promptly and effectively to any sexual harassment found to have occurred. The District did not keep records of interviews with Student A, Student B, Student C, or any other witnesses that may have been identified by the parties. The principal, who said he interviewed these three students, was unable to describe specifics steps taken by the District to collect the evidence or to analyze the evidence obtained including specific details about any interview he conducted of Student A. The principal did not review the timeline on the video surveillance and ask the student's questions about the incident in order to compare it to the students' version of events to determine the credibility of the parties. He also did not give Student A the opportunity to present her physical evidence such as her cell phone (which could have confirmed or negated her version of events as to the time that the alleged incident concluded) or the results of her rape kit. Student A told OCR that the principal had not actually interviewed her at all. Furthermore, with respect to the evidence that was gathered and reviewed by the principal, the District did not apply any particular standard of proof and relied heavily on the outcome of the criminal proceedings that were filed in this case.

In the letter written by the superintendent described above, the District acknowledged that it did not conclude its investigation into Student A's parents' allegations of sexual assault until August 2011, which was over eight months after the first incident. The principal stated that he discontinued his investigation because the detective who was investigating the criminal matter told him to. He also stated, however, that he had essentially completed his investigation at the time the detective told him to stop and that the District was waiting for the prosecutor to uncover information that would help his investigation. The District did not investigate or respond to most of the subsequent complaints made by the parents regarding their allegations of ongoing harassment and retaliation against Student A. Moreover, as noted above, within two weeks of the initial complaint of sexual harassment, a second incident involving the same alleged harasser was reported by another female student, but the District did not consider this information in determining whether or not a hostile environment existed in the school and did not take steps to investigate that incident.

Page 18 – Catherine A. Tracey, Esq.

OCR also looked to see whether the District took interim measures such as separating the student reporting the harassment from the alleged perpetrator in classes, at lunch, and after school activities. The evidence supports a conclusion that the District took some interim steps but that the interim measures were not adequate to prevent harassment from reoccurring. School administrators changed Student B's classes; District records indicate that this happened approximately 2.5 weeks after the alleged incident occurred. The District also held two emergency meetings with staff at the high school regarding the incident. The District did not take steps to ensure that Student A was able to attend afterschool activities, including academic study sessions, without being confronted by Student B. Effective steps to address this issue could have included meeting with Student A and her parents to proactively identify her afterschool needs and then implementing a plan to provide her with safe access to those activities. Rather, the District advised Student A's mother to tell Student A that when she wanted to stay after school she should talk to a teacher or an administrator and they would see what they could do to make her feel safe.

Finally, OCR looked to see whether the District took steps to stop further harassment and prevent any retaliation against Student A, Student C, or any of the witnesses involved in the investigation. At a minimum, a school's responsibilities include making sure that the harassed students and their families know how to report any subsequent problems, conduct follow-up inquiries to see if there have been any new incidents or any instances of retaliation, and responding promptly and appropriately to address continuing or new problems. The evidence supports a conclusion that the District did not take steps to stop further harassment and prevent retaliation. The District did not provide information to the harassed students or their families about how to report any subsequent problems, did not conduct follow-up inquiries, and only minimally responded to some of the new concerns of harassment, intimidation, and safety that were raised by Student A's parents rather than investigate them. Finally, the District did not follow its policy regarding electronically transmitted forms of harassment. As mentioned above, the District's policy states that electronically transmitted forms of harassment may also be subject to disciplinary measures whether it takes place on or off school property. According to Student A, however, the principal told her there was nothing that the District could do about the harassing statements made to her on Formspring because they did not occur on school property. OCR notes that the District's policy correctly addresses harassment that is electronically transmitted and that could include harassment that occurs off campus, if the effects of such harassment manifest on campus and serve to deny or limit a student's ability to participate or benefit from the District's program. The District should take steps to ensure that all District administrators are aware of and consistently implement that policy.

In evaluating the District's grievance procedures, OCR first looked to see whether the District's grievance procedures contain the elements OCR has identified as necessary to ensure a prompt and equitable response to allegations of sexual harassment. OCR noted that, while the District's grievance procedures do not provide notice of and the contact information for where complaints may be filed, its student handbook and Board policies reference the contact information for where complaints of discrimination may be filed,

although a retired employee is named as the contact person. The grievance procedures do not provide an assurance of an adequate, reliable, and impartial investigation of complaints. OCR also noted that, while the grievance procedures provide a timeframe of five days for concluding the investigation, the procedures do not require the District to provide complainants with an opportunity to present witnesses and other evidence. In addition, the District's grievance procedures require that complainants first engage in an informal and verbal process before proceeding with a formal and written grievance. Moreover, while the District's grievance procedures require that the District provide written notice to the complainants of the outcome of the investigation, the District in the instant case did not do so.

In addition, the evidence supports a finding that the District's nondiscrimination policy and grievance procedures for handling discrimination complaints do not provide effective means for preventing and responding to sexual harassment. The evidence obtained by OCR supports that students, parents, and District administrators (including the individual responsible for the District's compliance with Title IX) were unaware of what kind of conduct constitutes sexual harassment and that such conduct is prohibited sex discrimination. As such, the evidence supports a finding that the District's general policy and procedures relating to sex discrimination are not effective and do not comply with Title IX.

## Conclusion

On September 28, 2012, the District submitted the enclosed Resolution Agreement to OCR to resolve this complaint. Pursuant to the Agreement, the District will: reimburse Student A for costs associated with counseling; pay for transportation costs for the time period Student A attended another school in the District that was farther away; conduct a review of her academic record for the 2010-2011 school year to identify any need for compensatory education or other academic measures; and, upon Student A's return to Central High School at the beginning of the 2012-2013 school year, take all necessary steps to ensure that the school takes immediate and effective action to eliminate any further harassment reported by Student A and to prevent any retaliation against her. In addition, the Agreement requires the following District-wide remedies: revision of the District's grievance procedures; designation of a Title IX coordinator; training for staff and administrators and age appropriate training for students; a climate check; creation of a student committee and advisory committee at Central High School to address issues of sexual harassment/sexual assault and provide recommendations to the District administration; and a community meeting to update interested parties on the District's ongoing anti-harassment program and efforts.

This concludes our investigation of this matter. We will monitor the implementation of the Agreement. If the District does not fully implement the Agreement, OCR will reopen the investigation and take appropriate action to ensure the District's compliance with Title IX.

Page 20 – Catherine A. Tracey, Esq.

This letter sets forth OCR's determination in an individual OCR case. This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such. OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public. The complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

The OCR contact person for the monitoring of the Agreement is Ms. Sacara Martin, who can reached at (216) 522-7640 or Sacara.Martin@ed.gov. We look forward to receiving the District's first monitoring report by October 31, 2012. If you have questions or concerns about this letter, you should contact Ms. Meena Morey Chandra, Team Leader, by telephone at (216) 522-2677.

Sincerely,

Catherine D. Criswell
Director

Enclosure